**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MISSOURI DEPARTMENT <br> OF SOCIAL SERVICES <br> 221 West High Street <br> Jefferson City, Missouri 65101 <br> <br>             Plaintiff, <br> <br>     v. <br> <br> UNITED STATES DEPARTMENT <br> OF HEALTH AND HUMAN SERVICES <br> 200 Independence Avenue, SW <br> Washington, DC 20201 <br> <br>        and <br> <br> ALEX M. AZAR II <br> Secretary of the United States Department <br> of Health and Human Services, <br> in his official capacity, <br> 200 Independence Avenue, SW <br> Washington, DC 20201 <br> <br>            Defendants. | Civ. No. 1:18-cv-2587 |

**COMPLAINT**

**INTRODUCTION**

1.  The Medicaid program is "a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308 (1980). This "system of 'cooperative federalism,'" *id.* (quoting *King v. Smith*, 392 U.S. 309, 316 (1968)), establishes a "set of intricate, ongoing relationships between the States and the Federal Government." *Bowen v. Massachusetts*, 487 U.S. 879, 900 n.31 (1988).

2.  In this case, the Missouri Department of Social Services ("DSS," "Missouri," or "the State"), seeks review of an administrative decision by Defendants' Departmental Appeals Board ("DAB") that has limited the amount that it can pay as disproportionate share hospital ("DSH") payments to psychiatric hospitals in the State. DSH payments are intended to help cover the cost of providing inpatient treatment to Medicaid patients and the uninsured, and are particularly important for psychiatric hospitals, which otherwise receive limited Medicaid funding. Each State receives an annual "DSH allotment" and from that allotment may spend up to a certain amount on psychiatric hospitals, which are known in Medicaid as institutions for mental diseases ("IMDs"). 42 U.S.C. § 1396r-4(f), (h). This limit on the amount of the DSH allotment that can be paid to IMDs is known as the IMD DSH cap.

3.  In 2014, Missouri discovered that the State's IMD DSH cap was incorrectly calculated and is lower than it should be, due to a reporting error that the State made on its Medicaid expenditure reports in 1995. For federal fiscal years ("FY") 2014 and 2015, Defendants have refused to release approximately $6 million in federal financial participation ("FFP") in Missouri's DSH payments to psychiatric hospitals, on the ground that they exceed the

State's artificially-low IMD DSH cap. If the cap were correctly calculated, FFP would be available.

4. In the decision under review, Defendants have rejected DSS's attempt to correct the error. Because they refused to permit the 1995 correction, the IMD DSH cap remains lower than it should be, and Defendants have refused to provide FFP for payments in excess of the uncorrected IMD DSH cap for FY 2014 and FY 2015, and will continue to refuse to make these payments in the future. Psychiatric hospitals in the State will be denied several million dollars a year in additional funding to which they would otherwise be entitled under the Medicaid statute, indefinitely into the future.

5. Defendants have not disputed that Missouri's DSH payments to psychiatric hospitals are now subject to an artificially low cap due to the way in which the State reported certain payments in 1995. Instead, Defendants' position is that the statute prohibits Missouri from correcting the reporting error because Section 1132 of the Social Security Act ("SSA") provides that a State must make all "claims" for federal funding in Medicaid expenditures within two years of the expenditure. 42 U.S.C. § 1320.

6. The two-year claiming rule has no application to this case, and it is reversible error for the Departmental Appeals Board to have used it to reject Missouri's attempt to correct the prior report. The purpose of the two-year time limit is to make it easier for HHS "to plan and administer the budget for [Medicaid and other] Social Security Act programs." *Connecticut v. Schweiker,* 684 F.2d 979, 982 (D.C. Cir. 1982), *cert. denied,* 459 U.S. 1207 (1983). As the Board has previously noted, otherwise "claims for millions of dollars for expenditures in years long gone by could turn up at any time." *New York State Dep't of Social Servs.,* DAB Dec. No. 521, at 8 (1984).

7. In this case, not a dime of expenditures in prior years are unexpectedly turning up to affect HHS's budget. Rather, Missouri is simply trying to move expenditures that were timely recorded as one type of hospital expenditure to another type of hospital expenditure, without requesting any additional federal funds. Nor does the correction affect the *total* amount of federal funding for Missouri's DSH payment in future years: it simply determines how much of the State's DSH allotment can be spent on psychiatric hospitals. Whether or not the 1995 error is corrected, Missouri continues to be entitled to spend its entire DSH allotment; it will just have to spend less on psychiatric hospitals than Congress permits for other States.

8. Because DSH allotments are set by statute, the Departmental Appeals Board has previously questioned whether the budgetary concerns protected by the two-year claiming rule are "even present for . . . any . . . state with DSH claims because DSH claims already have a finite limit under the state DSH allotment." Accordingly, a State's adjustment to its DSH claims does not present "a situation where HHS would be caught completely off guard by a state's unforeseen retroactive claims." *Virginia Department of Medical Assistance Services,* DAB No. 1838 (2002). This is particularly so here, where the State is not requesting any additional federal funding, just the authority to spend it on payments to psychiatric hospitals, rather than acute care hospitals.

9. Missouri's correction of the 1995 report and resulting correction to its IMD DSH limit is not a "claim" for federal funds. The Board's contrary ruling is arbitrary, capricious, and not in accordance with either the text or the purpose of the statute.

## JURISDICTION AND VENUE

10. This action arises under Section 1116 of the Social Security Act, 42 U.S.C. § 1316(e)(2)(C), and Section 10 of the Administrative Procedure Act, 5 U.S.C. § 704. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

11. Venue is proper under 28 U.S.C. § 1391(e)(1) and 42 U.S.C. § 1316(e)(2)(C).

## PARTIES

12. Plaintiff Missouri Department of Social Services ("Department," "DSS," "Missouri," or "State") is the "single State agency" responsible for administration of the State of Missouri's participation in the federal Medicaid program. *See* 42 U.S.C. § 1396a(a)(5).

13. Defendant United States Department of Health and Human Services ("HHS") is the federal agency responsible for administering the Medicaid program.

14. Defendant Alex. M. Azar II is the Secretary of HHS and is responsible for the overall administration of the agency. He is sued in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

**The Medicaid Program and Medicaid Funding**

15. Medicaid is a cooperative federal-state program under which the federal government provides financial assistance to participating States in connection with the provision of health care to lower-income individuals and families. Under the federal Medicaid statute (Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*), States are entitled to reimbursement for a specified percentage of the actual costs they incur in providing health care to their Medicaid-eligible populations. *See id.* § 1396b(a).

16. A State participating in the Medicaid program must obtain CMS's approval of a state plan for medical assistance. *See id.* § 1396a. The State receives federal reimbursement for its expenditures on medical assistance under its state plan. *See id.* § 1396b.

17. The federal government's share of a State's expenditures under the Medicaid program is called "federal financial participation" ("FFP"). 42 C.F.R. § 400.203; 45 C.F.R. § 95.4.

18. The federal Medicaid statute and related regulations establish the procedures by which States receive FFP for their Medicaid expenditures.

19. Within 30 days after the end of each quarter, the State submits a Form CMS-64 ("Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program"). *See* 42 C.F.R. § 430.30(c)(1). On the Form CMS-64, the State reports its accounting of its actual recorded expenditures for the quarter. *See id.* § 430.30(c)(2).

20. A State may report expenditures on a Form CMS-64 in a quarter after the quarter in which the State incurs those expenditures (for example, when providers of medical assistance do not submit their claims to the State until after the end of the quarter in which they provided the covered services). These "prior period adjustments" are, in effect, reimbursement claims for expenditures from an earlier quarter.

**Medicaid DSH Payments for Patients in Institutions for Mental Diseases**

21. Section 1902(a)(13)(A)(iv) of the SSA requires that state Medicaid programs make Disproportionate Share Hospital or "DSH" payments to qualifying hospitals that serve a large number of Medicaid and uninsured individuals. The purpose of the DSH provision is to ensure the continued viability of hospitals serving a disproportionate share of low-income patients by providing these hospitals with additional funds, beyond the funds paid for delivering specific services to specific Medicaid enrollees.

22. Federal law also establishes an annual "DSH allotment" for each state that limits the amount of FFP for total statewide DSH payments made to hospitals. 42 U.S.C. § 1396r-4(f)(3).

23. DSH payments are an important source of funding for psychiatric hospitals and other mental health facilities known in Medicaid as "institutions for mental diseases" or "IMDs." An IMD is "a hospital, nursing facility, or other institution of more than 16 beds that is primarily engaged in providing diagnosis, treatment or care of persons with mental diseases, including medical attention, nursing care and related services." 42 C.F.R. § 435.1010. These hospitals often serve a large number of uninsured low-income patients, including many who would be eligible for Medicaid but for the fact that they are a patient in an IMD. That is because Medicaid only pays for services in an IMD for children aged 21 or under, and adults age 65 and over. 42 U.S.C. § 1396d(a)(29)(B). This provision is known as the "IMD exclusion."

24. In the 1990s, Congress became concerned that extensive use of DSH payments to psychiatric hospitals could allow States to do what the IMD exclusion was intended to prevent, *i.e.*, shift the cost of state psychiatric facilities from states to the federal government. Accordingly, in 1997, Congress enacted legislation capping DSH payments to IMDs, thereby creating "IMD DSH limits." Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 511–14 (1997).

25. Specifically, Section 1923(h) limits aggregate state DSH payments to IMDs in a fiscal year to the lesser of:

> (1) "The total State DSH expenditures that are attributable to fiscal year 1995 for payments to institutions for mental diseases and other mental health facilities (based on reporting data specified by the State on HCFA Form 64 as mental health DSH, and as approved by the Secretary).";

> (2) The "applicable percentage" of the State's DSH allotment to all hospitals in the State.

§ 1396r-4(h)(1); Balanced Budget Act of 1997 § 4721.

26. The "applicable percentage" for years after FFY 2002 is the lesser of 33 percent or the "1995 percentage." The "1995 percentage" is the ratio of:

> "(i) the Federal share of payment adjustments made to hospitals in the State under subsection (c) that are attributable to the 1995 DSH allotment for the State (as reported by the State not later than January 1, 1997, on HCFA Form 64, and as approved by the Secretary) for payments to institutions for mental diseases and other mental health facilities, to
>
> "(ii) the State 1995 DSH spending amount."

*See* § 1396r-4(h)(1); Balanced Budget Act of 1997 § 4721.

27. The IMD DSH limit is applied to each state's DSH allotment. Put differently, the sum of the state's IMD DSH payments and the state's regular hospital DSH payments must not exceed the state's total DSH allotment. Thus, the cap on IMD DSH payments enacted in 1997 has no effect on the total amount of DSH funding available to each State, which is fixed by statute.

28. Each year, CMS calculates the DSH allotment and IMD DSH limits for each state and publishes them in the Federal Register.

**Two-Year Deadline for Claiming Federal Reimbursement for Expenditures**

29. Under Section 1132(a) of the SSA, "any claim by a State for payment with respect to an expenditure made during any calendar quarter by the State" must be filed "within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter." 42 U.S.C. § 1320b-2(a). Federal reimbursement is generally not

available if a State's claim for reimbursement is "not made within such two-year period." 42 U.S.C. § 1320b-2(a).

30. HHS has promulgated regulations pursuant to Section 1132(a). *See* 45 C.F.R. §§ 95.1–.34. These regulations refer to "a two year time limit . . . for a State to claim Federal financial participation in expenditures under [approved Medicaid] State plans." *Id*. § 95.1(a). In the normal course, CMS will reimburse a State for an expenditure claimed on a Form CMS-64 "only if the State files a claim with us for that expenditure within 2 years after the calendar quarter in which the State agency made the expenditure." *Id*. § 95.7.

31. The regulations define "claim" as "a request for Federal financial participation in the manner and format required by [Medicaid] program regulations, and instructions or directives issued thereunder." "Federal financial participation" is in turn defined as "the Federal government's share of an expenditure made by a State agency under [the Medicaid program]." *See* 45 C.F.R. § 95.4; *see also* 42 C.F.R. § 400.203.

## FACTUAL BACKGROUND

**Missouri's Reporting of Its 1995 IMD DSH Payments**

32. At the time of the enactment of Section 1923(h), and for some years prior, Line 2B of the Quarterly Expenditure Report (then known as the HCFA-64 and now known as the CMS-64) asked States to report "Mental Health Fac Service - DSH Adjustment."[1] The form did not (and does not) provide guidance regarding the types of facilities covered by this line. In 1995 and for many years thereafter, DSS believed that Line 2B referred only to payments to

---

[1] Before 2001, CMS was known as the Health Care Financing Administration or "HCFA". For ease of reading, we refer to the agency as CMS in this Complaint, even when referring to events or actions before 2001. We also refer to the expenditure reporting form as the CMS-64, even though at the time it may have been called the HCFA-64.

9

psychiatric institutions operated by the State, and not to privately-operated psychiatric institutions.

33. As a result, for the FFY 1995 reporting year, Missouri made and reported $207,234,618 in DSH payments to state-operated psychiatric hospitals on CMS-64 Line 2B ("Mental Health Fac Service - DSH Adjustment"), and erroneously reported the additional $9,902,046 in DSH payments that it paid to private psychiatric hospitals with its other DSH payments on CMS-64 Line 1B ("Inpatient Hospital Service - DSH Adjustments"). That is, Missouri omitted $9,902,046 in DSH payments to private psychiatric hospitals from the line for DSH payments to IMDs, and instead reported those expenditures on Line 1B for DSH payments to acute care hospitals. At the time (1996), reporting IMD DSH payments in this way did not impact Missouri's claim for FFP in those payments. CMS paid the federal share for the expenditures reported on both lines of the expenditure report.

34. The next year (1997), Congress enacted Section 1923(h) of the SSA, which capped each State's IMD DSH limit based on its FFY 1995 payments. In 1998, CMS published a notice in the Federal Register announcing each State's FFY 1995 IMD DSH payment amount and FFY 1995 IMD DSH percentage, which would serve as the basis for each State's IMD DSH limit in future years. *See* 63 Fed. Reg. 54,142, 54,145 (Oct. 8, 1998). These numbers were based on each State's CMS-64 for expenditures attributable to FFY 1995. In making this announcement in the Federal Register, CMS did not seek confirmation that its calculations were correct or invite comments from States or other parties regarding its calculations. *See id*.

35. CMS calculated Missouri's FFY 1995 percentage to be 28.42 percent, based on the State's reported payments of $207,234,618 for DSH Mental Health Facility Services, divided by the State's total FFY 1995 DSH expenditures of $729,181,142. *See* 63 Fed. Reg. at 54,145.

Because Section 1923(h) defines the "applicable percentage" to be the lower of a specified percentage set forth in statute (33% since 2002) or the percentage of DSH that the State paid to IMDs in FY 1995, and because 28.42 percent was lower than the specified percentages in the statute, 28.42 percent has been Missouri's "applicable percentage" since the statute went into effect.

36. If CMS had included Missouri's payments to private IMD facilities (which were reported on Line 1B), Missouri's applicable percentage would be 29.78 percent ($217,136,664/$729,181,142), instead of 28.42 percent, and Missouri's IMD DSH limit would be the lesser of 29.78 percent of its total DSH allotment or its FFY 1995 total DSH spending on IMDs, which was $217,136,664.  *See* 63 Fed. Reg. at 54,145.

**The First Disallowance**

37. Missouri continued to report expenditures to private IMDs on Line 1B after 1995, and CMS continued to review and accept those expenditures for federal financial participation. It was not until CMS disallowed the FY 2014 private IMD payments that the State learned that payments to private IMDs should be reported together with public hospital payments and sought to correct its 1995 reporting mistake so that its IMD DSH percentage would accurately reflect the percentage of its DSH payments spent on IMDs in the base year.

38. On December 23, 2014, CMS deferred $2,438,638 in FFP for DSH payments DSS made to IMDs in FFY 2014.  The deferral letter indicated that DSS claimed $130,986,272 in FFP for DSH payments to public and private IMDs in FFY 2014, which exceeded CMS's preliminary calculation of the FFY 2014 IMD DSH limit for Missouri ($128,547,634) by $2,438,638, *see* 79 Fed. Reg. 11,436 (Feb. 28, 2014).

39.     In response to the deferral, DSS asked CMS to recalculate the State's IMD DSH limit to account for the fact that DSS mistakenly did not include payments made to private IMDs in FFY 1995 on the correct line of the CMS-64.  Specifically, DSS explained that it reported its DSH expenditures for privately-owned IMDs on Line 1B of the CMS-64, instead of Line 2B, where it only reported its publicly-owned IMDs.

40.     On June 4, 2015, CMS disallowed the $2,438,638 in FFP, rejecting the State's arguments.  Letter from James G. Scott, Assoc. Reg'l Adm'r for Medicaid & Children's Health Operations, to Brian D. Kinkade, Dir. Mo. Dep't Soc. Servs., at 2 (June 4, 2015) (internal quotation marks omitted) (Exh. 1).  DSS appealed the disallowance.

41.     On February 11, 2016, the HHS Departmental Appeals Board ("DAB" or "Board") issued a decision sustaining the disallowance.  In its decision, the Board emphasized that it could not consider the State's arguments that its IMD DSH cap was incorrect, because DSS had not attempted to amend its FFY 1995 CMS-64 to move the $9.9 million in DSH payments to non-public IMDs from Line 1B to Line 2B of the FFY 1995 CMS-64.  *Missouri Dep't of Soc. Servs.*, DAB No. 2677.  The Board explained:

> Medicaid regulations, and the long-established program instructions that implement those regulations, require states to report Medicaid program expenditures and retroactive adjustments on the [CMS-64] (as opposed to merely documenting them in a Board proceeding) and to certify that report as reflecting actual (rather than estimated) and allowable costs.  As Missouri is well aware, the mechanism for retroactively adjusting a previously reported expenditure amount is a "prior period adjustment," entered on the appropriate schedule of the [CMS-64]. . . . Missouri does not allege that it has tried to revise its official reporting of those payments. We are unaware of any circumstance in which the Board has approved, or directed CMS to approve, an adjustment to a state's [CMS-64] without the state's first having attempted to secure CMS's approval for the adjustment through the normal expenditure reporting process.

*Id*. at 12. (emphasis in the original).

**The Second Disallowance**

42. Less than three weeks after the Board's decision, on February 29, 2016, DSS submitted its CMS-64 for the quarter ending December 31, 2015. In that expenditure report, in response to and in compliance with the Board's decision, DSS included a prior period adjustment for 1995 in which it removed the payments to private psychiatric hospitals from the general DSH line (Line 1B) and reported them instead on the mental health DSH line (Line 2B). The effect was to increase its claim for FFP for mental health DSH by $9,902,046 and to decrease the claim for FFP for other DSH by the exact same amount. There was no overall increase in the claim for FFP; no additional FFP was claimed.

43. On that same CMS-64 quarterly report, DSS likewise made two additional increasing prior period adjustments on Line 2B: $2,409,185 (FFP) for FFY 2014 and $1,675,829 (FFP) for FFY 2015. *Id*. These two prior period adjustments moved the DSH payments to private IMDs for FFY 2014 and FFY 2015 from Line 1B to Line 2B. *Id*. DSS also made corresponding decreasing prior period adjustments in equal amounts to Line 1B. The net impact in expenditures claimed was $0; no additional FFP was claimed.

44. On November 21, 2016, CMS disallowed $10,011,389 in FFP for these prior period adjustments, and later denied Missouri's request for reconsideration of the disallowance for the FFY 1995, FFY 2014, and FFY 2015 adjustments. *See* Exh. 2; Exh. 3. CMS asserted that Missouri's FFY 1995 and FFY 2014 adjustments exceed the two-year time limit to file claims under Section 1132(a) of the SSA and 45 C.F.R. § 95.7.

45. DSS appealed the disallowance.

**The Third Disallowance**

46. On June 30, 2017, CMS disallowed $571,007 in FFP for FFY 2016 DSH payments the State made to IMDs. CMS argued that Missouri's FFY 2016 DSH payments exceeded Missouri's IMD DSH limit. CMS asserted that the State's IMD DSH limit for FFY 2016 is $131,138,066 (FFP) and that Missouri claimed $131,709,073 (FFP) in DSH payments to IMDs in that year. CMS also alleged that the excess IMD DSH payments were improperly claimed on the CMS-64 for the quarter ended ("QE") September 30, 2016, on Line 49 – Other Services ("Line 49").

47. DSS appealed the disallowance. On August 9, 2017, the Board granted the State's request to stay DSS's appeal of this third disallowance, pending resolution of DSS's appeal of the previous disallowances for FFYs 1995, 2014, and 2015.

48. The FFY 2016 disallowance is still pending before the Departmental Appeals Board and not directly part of this action.

**The Board's Disallowance Decision**

49. On September 10, 2018, the Board issued a decision sustaining the second disallowance, involving the prior period adjustments for FFYs 1995, 2014, and 2015. *See Missouri DSS*, DAB No. 2892. In its decision, the Board agreed with CMS that the prior-period adjustments for FY 1995 and the first quarter of FY 2014 constituted untimely requests for FFP in violation of the two-year claim filing rule. The Board also agreed with CMS that the prior-period adjustments for FYs 2014 and 2015 would cause Missouri to exceed its IMD DSH limit.

**CMS Refuses to Accept Missouri's Repeated Attempts to Correct its 1995 Reporting**

50. As explained above, the State has made numerous attempts to correct its decades-old DSH reporting mistake to ensure that it is not forever penalized by this single reporting.

51.     Missouri has repeatedly sought to correct CMS's published "preliminary" FFY 2014 and 2015 IMD DSH limits, before those preliminary caps were finalized in the Federal Register.  For example, on March 9, 2015, in response to a CMS deferral, DSS wrote to CMS explaining exactly why its IMD DSH limit was incorrectly calculated, with supporting documentation, and requested that CMS fix the error.  Exh. 4.  CMS refused and instead disallowed the DSH payments to IMDs that exceeded the artificially low IMD DSH cap.  Similarly, in response to the Board's February 2016 instruction, *Missouri Dep't of Soc. Servs.*, DAB No. 2677, the State sought to correct its FFY 1995 reporting by submitting a prior period adjustment to CMS that amended the State's FY 1995 Medicaid expenditure report to move the DSH payments to private IMDs from Line 1B to Line 2B of the CMS-64.

52.     CMS has rejected all of the State's efforts to correct its FFY 1995 DSH reporting, taking the position that there is nothing the State can do to avoid the artificially low IMD DSH limit.  In so doing, CMS is preventing Missouri from making DSH payments to IMDs up to the amount permitted under Section 1923(h).

## COUNT I

**(Administrative Procedure Act: Violation of the Medicaid Statute and Regulations and Arbitrary and Capricious Agency Action)**

53.     Paragraphs 1 through 52 above are incorporated herein by reference.

54.     The decision that the State's correction of its 1995 reporting error, which did not seek any federal financial participation beyond what the State had already received, was in violation of the two-year claiming rule is arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT II

**(Administrative Procedure Act: Violation of the Medicaid Statute and Regulations and Arbitrary and Capricious Agency Action)**

55. Paragraphs 1 through 54 above are incorporated herein by reference.

56. The decision upholding the disallowance for FY 2014 and 2015 IMD DSH payments, which was solely a result of the refusal to permit adjustment of the State's IMD DSH cap to reflect the actual amount expended for DSH expenditures to IMDs in 1995, is arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT III

**(Administrative Procedure Act: Violation of the Medicaid Statute and Regulations and Arbitrary and Capricious Agency Action)**

57. Paragraphs 1 through 56 above are incorporated herein by reference.

58. The Defendants' refusal to modify the State's IMD DSH percentage to reflect the amounts permitted by Section 1923(h) is arbitrary and capricious, an abuse of discretion, and contrary to law.

## REQUEST FOR RELIEF

WHEREFORE, Missouri requests that this Court grant the following relief:

A. Permanently enjoin Defendants and their agents, employees, successors in office, and all persons acting in concert or participation with them, from disallowing the funds at issue in this disallowance;

B. Permanently enjoin Defendants and their agents, employees, successors in office, and all persons acting in concert or participation with them from preventing Missouri from correcting its FFY 1995 CMS-64 to accurate reflect DSH payments made to all IMDs in 1995;

C. Order and instruct Defendants and their agents, employees, successors in office, and all persons acting in concert or participation with them, to recalculate Missouri's IMD DSH percentage as set forth in SSA Section 1923(h);

D. Award Missouri such declaratory and other relief as may be just and proper;

E. Award Missouri the costs of this action, including attorneys' fees; and

F. Retain jurisdiction over this action for such additional and supplemental relief as may be required to enforce the order and judgment.

Respectfully submitted,

/s/ Philip J. Peisch
Philip J. Peisch (D.C. Bar No. 1005423)
Caroline M. Brown (D.C. Bar No. 438342)
Brown & Peisch PLLC
850 10th Street NW
Washington, DC 20001
(202) 499-4258
ppeisch@brownandpeisch.com
cbrown@brownandpeisch.com

*Attorneys for Plaintiff*
Missouri Department of Social Services
221 West High Street
Jefferson City, Missouri 65101

November 9, 2018